IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| RASHAUN RULEY, | : | Civil Action No. 4:14-CV-0478 |
| | : | |
| | : | |
| Plaintiff, | : | (Judge Brann) |
| | : | |
| v. | : | |
| | : | |
| JOHN WHIPPLE, | : | |
| | : | |
| Defendant. | : | |

## MEMORANDUM
March 16, 2016

Pending before this Court is a motion for summary judgment filed by

Defendant John Whipple (hereinafter "Officer Whipple") against Plaintiff Rashaun

Ruley (hereinafter "Plaintiff"). The motion seeks to dismiss Plaintiff's claim of

malicious prosecution.[1] The matter has been fully briefed and is now ripe for

disposition.  In accordance with the following reasoning, Officer Whipple's motion

for summary judgment is granted.

## I. BACKGROUND

Plaintiff's complaint stems from a criminal investigation resulting in his

arrest. On June 3, 2010, Confidential Informant Harry William Day, Jr.

---

[1] ECF No. 1. Plaintiff's complaint lists three Counts, Count I for malicious prosecution, Count II for violation of Plaintiff's substantive due process rights, and Count III, a state law claim for false imprisonment. Count III was dismissed with prejudice by stipulation of the parties. ECF No. 21. Officer Whipple's motion for summary judgment initially sought dismissal of Counts I and II. In his brief in opposition to the motion for summary judgment, Plaintiff voluntarily dismisses Count II. ECF No. 52. Count I is addressed in this Memorandum.

(hereinafter "CI Day"), set up a drug transaction in Williamsport, Pennsylvania with a suspected drug dealer (hereinafter "Suspect"), known as "B" or "Banks" under the observation of Officer Whipple, a Pennsylvania State Police Officer in the Vice Narcotics Unit. That same day, Suspect sold CI Day two grams of crack cocaine. The transaction occurred under surveillance and photographs were taken of Suspect. Officer Whipple, along with multiple other officers, was involved in the surveillance and had the opportunity to observe Suspect's face from the left side.

Several months later, on October 29, 2010, CI Day informed Officer Whipple that one of the suspects from the June 3, 2010 investigation may be Ronald Ruley, later identified as Plaintiff's brother. Officer Whipple prepared and displayed a photo array with a photo of Ronald Ruley (and with no photo of Plaintiff); after viewing the photo array, CI Day, however, stated that the person who sold him drugs on June 3, 2010 was not pictured.

Two weeks later, on November 9, 2010, after showing Ronald Ruley's photograph to Viva Bolden, who was being held by the authorities for possession with intent to deliver, she told Officer Whipple that Ronald Ruley was incarcerated at the time of the June 3, 2010 investigation. Officer Whipple then learned that Ronald Ruley resided with his mother and brother, Plaintiff, at the same address prior to his incarceration. Officer Whipple prepared another photo array including

2

Plaintiff's photograph and showed it to CI Day. CI Day promptly indicated that the photograph of Plaintiff was the person he knew as "B" or "D" who sold him drugs on June 3, 2010. Officer Whipple also showed Plaintiff's photograph to Ms. Bolden who also identified Plaintiff and further indicated that he was involved in selling drugs.

Later that same day, CI Day contacted Officer Whipple and informed him that he had encountered Plaintiff in the parking lot of Weis Market on Third Street in Williamsport. While in the parking lot, Plaintiff identified CI Day as an informant and slapped him. CI Day then followed Plaintiff and watched him enter a home in the area of 645 Second Street, Williamsport, later identified as Plaintiff's residence.

Two days later, on November 12, 2010, Officer Whipple learned that Ms. Bolden and Plaintiff had a conversation about the informant whose information resulted in her arrest and who he believed was CI Day. Ms. Bolden also told Officer Whipple that she knew that Plaintiff had sold drugs to CI Day on a few occasions.

Five months later, on April 8, 2011, a second confidential informant attempted to call "B," believed to be Plaintiff, while under the observation of Officer Whipple. When she was unable to reach him, she went to 645 Second Street to attempt to make physical contact with him. While there, Donna Burney,

later identified as Plaintiff's mother, answered the door and provided a telephone number to reach "Banks," also believed to be Plaintiff. After attempting and failing to reach "Banks" at the number provided, Ms. Burney stated that Banks' "Baby Mama" had the crack cocaine. Ms. Burney and the confidential informant then walked across the street together and Ms. Burney retrieved the crack cocaine from another woman and sold it to the confidential informant. As a result of this transaction, Ms. Burney was arrested and subsequently pled "no contest" to one count of possession of a controlled substance.

With his investigation completed, Officer Whipple filed the following charges against Plaintiff for his involvement in the June 3, 2010 drug transaction: possession with intent to deliver, delivery of a controlled substance, possession of a controlled substance, criminal use of a communication facility, intimidation of witnesses or victims, retaliation against a victim or party, and harassment. A warrant was issued and Plaintiff was taken into custody on February 25, 2012.

Prior to the preliminary hearing, Officer Whipple again showed CI Day a photo array and he positively identified Plaintiff as the person who sold him crack cocaine on June 3, 2010 and later approached him at Weis Market. CI Day subsequently positively identified Plaintiff as the person who sold him crack cocaine on June 3, 2010 at the preliminary hearing.

4

At the end of July 2012, Ms. Burney, Plaintiff's mother, and Plaintiff's defense attorney met with the Lycoming County district attorney to inspect the surveillance photographs taken during the June 3, 2010 drug transaction. Both denied that the photographs depicted Plaintiff. Around the same time, on July 25, 2012, Plaintiff posted bail and was released after being incarcerated since February 25, 2012.

Prior to Plaintiff's criminal trial, CI Day informed Officer Whipple that he was "done" working as a confidential informant. One day later, Officer Whipple was informed by the district attorney that the charges against Plaintiff would be withdrawn and that CI Day would no longer be used as a confidential informant. The charges against Plaintiff were nolle prossed on August 31, 2012.

## II. LEGAL STANDARD

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[2] A fact is "material" where it "might affect the outcome of the suit under the governing law."[3]  A dispute is "genuine" where "the evidence is such that a reasonable jury," giving credence to the evidence favoring the nonmovant

---

[2] Fed. R. Civ. P. 56(a).
[3] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

and making all inferences in the nonmovant's favor, "could return a verdict for the nonmoving party."[4]

The burden of establishing the nonexistence of a "genuine issue" is on the party moving for summary judgment.[5] The moving party may satisfy this burden by either (i) submitting affirmative evidence that negates an essential element of the nonmoving party's claim; or (ii) demonstrating to the Court that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's case.[6]

Where the moving party's motion is properly supported, the nonmoving party, to avoid summary judgment in his opponent's favor, must answer by setting forth "genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."[7] For movants and nonmovants alike, the assertion "that a fact cannot be or is genuinely disputed must" be supported by "materials in the record" that go beyond mere allegations, or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."[8]

---

[4] *Id.*
[5] *In re Bressman*, 327 F.3d 229, 237 (3d Cir. 2003) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 331 (1986) (Brennan, J., dissenting)).
[6] *Id.* at 331.
[7] *Anderson*, 477 U.S. at 250.
[8] Fed. R. Civ. P. 56(c)(1); *see also Anderson*, 477 U.S. at 248–50.

"When opposing summary judgment, the non-movant may not rest upon mere allegations, but rather must 'identify those facts of record which would contradict the facts identified by the movant.'"[9] Furthermore, "[i]f a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion."[10]

In deciding the merits of a party's motion for summary judgment, the Court's role is not to evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial.[11] Credibility determinations are the province of the factfinder, not the district court.[12] Although the Court may consider any materials in the record, it need only consider those materials cited.[13]

## III. DISCUSSION

### A. Malicious Prosecution

Officer Whipple now seeks to dismiss Plaintiff's remaining count of malicious prosecution. To establish a claim for malicious prosecution pursuant to 42 U.S.C. § 1983, a plaintiff must show:

(1) the defendants initiated a criminal proceeding;
(2) the criminal proceeding ended in the plaintiff's favor;
(3) the proceeding was initiated without probable cause;

---

[9] *Port Auth. of N.Y. and N.J. v. Affiliated FM Ins. Co.*, 311 F.3d 226, 233 (3d Cir. 2003).
[10] Fed. R. Civ. P. 56(e)(2).
[11] *Anderson*, 477 U.S. at 249.
[12] *BWM, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992).
[13] Fed. R. Civ. P. 56(c)(3).

7

(4) the defendants acted maliciously or for a purpose other than bringing the plaintiff to justice; and

(5) the plaintiff suffered a deprivation of liberty consistent with the concept of seizure as a consequence of a legal proceeding.[14]

Officer Whipple argues that Plaintiff fails to establish that the criminal proceeding ended in his favor, that the proceeding was initiated without probable cause, and that Officer Whipple acted maliciously for a purpose other than bringing the plaintiff to justice.

1. *It is unclear whether Plaintiff's criminal proceeding ended in Plaintiff's favor.*

Officer Whipple first argues that the record does not establish Plaintiff's innocence. He alleges that, while a nolle prossed order can be sufficient to satisfy the favorable termination requirement, the nolle prossed order in this case was not sufficient because it does not indicate on its face that Plaintiff was innocent and because it was entered as a direct result of CI Day's resignation.

Plaintiff, conversely, argues that Plaintiff's testimony maintaining his innocence and Officer Whipple's testimony that both Plaintiff's mother and criminal defense attorney viewed the photographs and indicated that Plaintiff was not Suspect is evidence on the record that Plaintiff was innocent of the charges. Plaintiff further states that the nolle prossed disposition was entered after the

---

[14] *DiBella v. Borough of Beachwood*, 407 F.3d 599, 601 (3d Cir. 2005) (*citing Estate of Smith v. Marasco*, 318 F.3d 497, 521 (3d Cir. 2003)).

matter was already on the Call of the List and scheduled for a criminal trial and was a formal abandonment of prosecution by the district attorney's office.

Criminal proceedings are "terminated in favor of the accused" by "the formal abandonment of the proceedings by the public prosecutor."[15] The formal abandonment of criminal proceedings is typically signified by the entry of a nolle prosequi.[16] While a disposition of nolle prosequi "can be sufficient to satisfy the favorable termination requirement for malicious prosecution, not all cases where the prosecutor abandons criminal charges are considered to have terminated favorably."[17] Only when the final disposition "is such as to indicate the innocence of the accused" may a nolle prosequi disposition be considered favorable termination of the charges for the purposes of malicious prosecution.[18]

In the matter at hand, the nolle prossed order states the following:

AND NOW, this 31 day of August, 2012, the court being informed by the Commonwealth that they will not prosecute the above captioned case, and with no objection by the attorney for the defendant, Michael C. Morrone, Esquire, it is HEREBY ORDERED and DIRECTED that this case be nol prossed and costs be placed on Lycoming County.[19]

It is unclear by the order, on its face, whether or not the final disposition indicated Plaintiff's innocence. The Court must, therefore, look to the record.

[15] Restatement (Second) of Torts § 659 (adopted by the Pennsylvania Supreme Court in *Haefner v. Burkey,* 626 A.2d 519, 521 (Pa.1993)).
[16] *Id.* at § 659, cmt. c, illus. e.
[17] *Donahue v. Gavin*, 280 F.3d 371, 383 (3d Cir. 2002) (*citing Hilfirty v. Shipman*, 91 F.3d 573, 579 (3d Cir. 1996)).
[18] *Id.* (*citing* Restatement (Second) of Torts § 660, cmt. a).
[19] ECF No. 49-3 at 7.

9

That record indicates that in his deposition, Officer Whipple stated that the charges were nolle prossed because CI Day "became problematic."[20] He explained that CI Day had been arrested for driving under the influence ("DUI") and began making statements indicating that he would cease being a confidential informant on the cases he was working on if the Commonwealth did not assist him with his DUI charges.[21] When Officer Whipple heard CI Day make these statements, he contacted the district attorney who stated that the Commonwealth would withdraw the charges against Plaintiff but that CI Day would no longer be utilized as a confidential informant.[22]

On the other hand, the record reflects that the charges against Plaintiff were dropped sometime after Plaintiff's mother and criminal defense attorney viewed the photographs of Suspect and told the district attorney that the man pictured in the surveillance photographs was not Plaintiff.[23] In his deposition, Officer Whipple states that the district attorney was aware that Plaintiff's mother and criminal defense attorney had viewed the photographs and indicated that Suspect was not Plaintiff when he told Officer Whipple that the charges would be withdrawn during their conversation about CI Day's statements.[24] Officer Whipple, however, does

---

[20] ECF No. 47-5 at 45.
[21] *Id.*
[22] *Id.*
[23] Surveillance photographs of Suspect in ECF Nos. 49-4, 49-5 (WHIPPLE 000437, 000438, 000439, 000440, 000441, 000454, 000455); Plaintiff in 49-14 (WHIPPLE 000549, 000550).
[24] ECF No. 47-5 at 49.

not specify if the district attorney indicated the exact reason the charges were being dropped. Plaintiff maintains that the charges were dropped as a direct result of his mother and criminal defense attorney viewing the surveillance photographs.

Consequently, the record is unclear as to whether the prosecutor abandoned the criminal charges against Plaintiff because he was innocent of the crime or because the confidential informant abandoned the case.

## 2. *Officer Whipple had probable cause to arrest Plaintiff*

For the purposes of a malicious prosecution claim, probable cause for arrest exists where "at that moment [of the arrest,] the facts and circumstances within [the officers'] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the petitioner had committed or was committing an offense."[25] The Court must "determine whether the objective facts available to the officers at the time of arrest were sufficient to justify a reasonable belief that an offense was being committed."[26] "[T]he mere fact that the suspect is later acquitted of the offense for which he is arrested is irrelevant."[27]

Officer Whipple argues that the criminal proceeding was initiated with probable cause because he relied on information provided by CI Day, a

---

[25] *Beck v. Ohio*, 379 U.S. 89, 91 (1964); see also *Johnson v. Campbell*, 332 F.3d 199, 211 (3d Cir. 2003) (*citing Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979)).

[26] *U.S. v. Glasser*, 750 F.2d 1197, 1206 (3d Cir. 1984) (*citing Beck*, 379 U.S. at 96).

[27] *DeFillippo*, 443 U.S. at 36.

confidential informant who had been reliable and who had worked on a number of cases. Plaintiff, on the other hand, contends that Officer Whipple was present at the controlled drug sale on June 3, 2010, observed Suspect, and had over twenty months to view the surveillance photographs taken before Plaintiff was arrested. He argues that it is clear that Plaintiff was not Suspect and that, therefore, Officer Whipple had no probable cause to arrest Plaintiff.

As stated above, the Court must determine whether the facts available to Officer Whipple *at the time of Plaintiff's arrest* were sufficient to warrant a prudent man in believing that Plaintiff had committed the offense for which he was arrested.

Officer Whipple had the following facts available to him at the time of the arrest: 1) Officer Whipple was present and observed the transaction on June 3, 2010 and observed the left side of Suspect's face; 2) CI Day identified Plaintiff as the man who sold him drugs on June 3, 2010; 3) CI Day identified Plaintiff as the man who slapped him in the Weis Market parking lot on November 9, 2010; 4) Viva Bolden stated that Plaintiff had previously sold both her and CI Day drugs on more than one occasion; and 5) a confidential informant attempted to buy drugs from Plaintiff on a separate occasion, was unable to reach him, and purchased drugs from Plaintiff's mother after Plaintiff's mother attempted and failed to reach Plaintiff.

12

Officer Whipple was present and observed the controlled drug sale on June 3, 2010.[28] He indicates, however, that that he only observed the left side of Suspect's face and was unable to observe the front.[29]  Officer Whipple testified that he did not utilize binoculars or any sort of assistive device in observing Suspect.[30]

Plaintiff argues that it is absolutely clear that he is not Suspect upon inspection of the photographs of Suspect compared to his physical appearance. Specifically, he argues that Plaintiff has multiple tattoos on his face, neck, and arms and has a darker skin tone, while Suspect does not have tattoos and has a lighter skin tone. Officer Whipple also admits that he is unable to make out any tattoos on the face or arms of Suspect in inspecting the surveillance photographs.[31]

Officer Whipple, however, did not have a current photograph of Plaintiff when he made the arrest. Instead, Officer Whipple testified that he used both a mug shot photograph of Plaintiff from an arrest in approximately 2008 together with old driver's license photographs of Plaintiff in composing the photo arrays shown to CI Day and Viva Bolden and in matching Plaintiff to the surveillance photographs of Suspect. Officer Whipple testified that none of the photographs of Plaintiff that he used in comparing Plaintiff to Suspect presented any tattoos on Plaintiff's face, unlike the current photograph of Plaintiff in WHIPPLE 000549

---

[28] ECF No. 47-4 at 28.
[29] *Id.*
[30] *Id.* at 29.
[31] *Id.* at 30.

and 000550.[32]  He did state, however, that the 2008 mug shot photo of Plaintiff

may have showed "some minor tattoos on his arms."[33] According to Officer

Whipple, "upon reviewing [the photographs that he had of Plaintiff at the time]

against this photograph [of Suspect] being a side photograph, I looked at his

physical description in his hair, his hairline, the thin Muslim beard, the pronounced

eyebrow area, and felt that they matched [Plaintiff]."[34] Outside of the photographs,

Officer Whipple had no interaction with Plaintiff prior to filing the criminal

charges against him.[35]

In addition to the photographs, Office Whipple relied heavily on the

information provided by CI Day. CI Day first told Officer Whipple that Suspect

could be Ronald Ruley, Plaintiff's brother, at the end of October, 2010, a few

months after the June 3, 2010 controlled drug sale. After reviewing a photo array

with Ronald Ruley's picture, however, CI Day stated that Suspect was not pictured

in the array. After obtaining information from Viva Bolden that Ronald Ruley was

incarcerated and learning that Plaintiff also resided at the same address as Ronald

Ruley, Officer Whipple obtained the photo of Plaintiff's 2008 arrest and included it

in the photo array he showed to CI Day. CI Day then identified Plaintiff as "B" or

"D" and stated that Plaintiff was Suspect. Officer Whipple also showed Ms.

---

[32] *Id.* at 36.
[33] *Id.* at 35.
[34] ECF No. 47-4 at 33.
[35] *Id.*

14

Bolden the photo of Plaintiff and she identified him and indicated that he was involved in selling drugs, albeit not specifically on the date of the June 3, 2010 controlled drug sale.

The same day that CI Day identified Plaintiff as Suspect and Viva Bolden identified Plaintiff as involved in drug activity, Officer Whipple was told that Plaintiff confronted CI Day and slapped him for being an informant in the Weis Market parking lot. Immediately thereafter, CI Day observed him enter Plaintiff's home. Again, CI Day identified Plaintiff as the man who confronted him in the Weis parking lot and as the man that sold him drugs on June 3, 2010. A few days later, Officer Whipple was told that Plaintiff had spoken to Viva Bolden about CI Day.

Immediately prior to the preliminary hearing following Plaintiff's arrest, CI Day again positively identified Plaintiff as the man who sold him drugs on June 3, 2010 after again selecting his photograph from a photo array. CI Day testified to that effect at the preliminary hearing.

CI Day had apparently been providing reliable information to the Pennsylvania State Police since 2005.[36] In his deposition, Officer Whipple testified that,

> "Mr. Day had been involved in a lot of investigations, had been
> involved in a lot of arrests. Up until that couple month period there, he

---

[36] ECF No. 50 at 18.

was spot on. He testified at preliminary hearings, provided good information, and had done a lot of good things, had gotten a lot of arrests, convictions."[37]

Officer Whipple consequently relied on CI Day's repeated statements that Plaintiff was indeed Suspect in filing charges against Plaintiff.

Officer Whipple cites *Napier v. City of New Castle*[38] in arguing that he had probable cause to arrest Plaintiff. In *Napier*, a confidential informant told officers that he could buy drugs from a drug dealer with the same name as the plaintiff in the case.[39] During the controlled drug sale, one of the officers was able to observe the transaction.[40] In reviewing driver's license photographs of the plaintiff, the officer who had observed the transaction determined that the plaintiff's license photograph resembled the drug dealer in the transaction.[41] After filing criminal charges and arresting the plaintiff, the officer noted that the plaintiff looked different from his memory of the drug dealer in the transactions, but decided that the changes in her appearance could occur in the three and one-half months between the transaction and the arrest.[42] It was subsequently determined that the plaintiff was not the person observed selling the drugs.[43] The court nevertheless

---

[37] ECF No. 47-5 at 46.
[38] 407 Fed. Appx. 578 (3d Cir. 2010).
[39] *Id.* at 580.
[40] *Id.*
[41] *Id.*
[42] *Id.* at 581.
[43] *Id.*

held that the officers had probable cause for the arrest.[44] The United States Court of Appeals for the Third Circuit's analysis of the case is relevant and persuasive to the case at hand.

The Court agrees that Officer Whipple had probable cause to arrest Plaintiff in connection to the events of June 3, 2010. The Court has inspected the photographs that Officer Whipple used in the photo arrays and to match Plaintiff to Suspect. While the photographs show that Plaintiff seemed to have a different complexion than Suspect, the photographs also seem to be free of multiple tattoos presented in Plaintiff's current photographs. Any tattoos that may have been present are unable to be clearly seen. Regardless, the photographs of Suspect were taken of his side and back and are simply not helpful in offering a positive identification. The difference between Plaintiff's older photographs and Suspect's photographs taken from afar could be attributed to lighting or the passage of time. The fact that Plaintiff and Suspect could be two different people would be much more easily noted by individuals who had contact with Plaintiff on a more frequent basis, like his mother or his criminal defense attorney.

With this in mind, Officer Whipple reasonably relied on CI Day's testimony. CI Day had had contact with Plaintiff on multiple occasions. CI Day identified Plaintiff as the individual who sold him drugs on June 3, 2010 from multiple photo

---

[44] *Id.* at 584.

arrays and on several occasions. He even testified to this during the preliminary hearing. CI Day had been an informant for approximately seven years at the time of Plaintiff's arrest and had provided reliable information on various cases over the years to the satisfaction of criminal law enforcement in Lycoming County.

Lastly, Officer Whipple certainly had sufficient probable cause to suspect that Plaintiff was involved in selling drugs. Plaintiff was identified by CI Day and Viva Bolden as a drug dealer. Officer Whipple observed another confidential informant attempt to purchase drugs from Plaintiff and instead purchase drugs from Plaintiff's mother only after she could not reach him. Both CI Day and Viva Bolden reported confrontations in the Weis Market parking lot during which information about CI Day being an informant was discussed.

In considering and evaluating all the information available to Officer Whipple at the time that the charges were filed against Plaintiff, particularly CI Day's statements and testimony, Officer Whipple had probable cause to arrest Plaintiff.

3. *There is no evidence on the record to suggest that Office Whipple acted maliciously or for a purpose other than bringing the plaintiff to justice*

Finally, Officer Whipple contends that there is no evidence on the record to prove that Officer Whipple acted maliciously or for some purpose other than bringing the plaintiff to justice. He argues that the arrest was made pursuant to an

arrest warrant issued by a magisterial district judge based upon Officer Whipple's affidavit of probable cause. He states that there is no evidence that the affidavit of probable cause contained false or misleading statements and no evidence that he concealed any exculpatory evidence.

Plaintiff, conversely, argues that Officer Whipple "acted recklessly and in an oppressive disregard of Plaintiff's rights when evidence demonstrated that he was not [Suspect]" and states that a factfinder may infer that an arrest was motivated by malice if there was an absence of probable cause.[45] This Court will not discuss Plaintiff's second argument that an inference may be made when an arrest was made without probable cause as it has held above that Officer Whipple had probable cause to arrest Plaintiff.

However, even if a court finds that an arrest was made pursuant to an arrest warrant issued by a magistrate after finding probable cause for the arrest, a plaintiff can still succeed on a § 1983 claim if he can show that "1) the police officer knowingly and deliberately, or with reckless disregard for the truth made false statements or omissions that create a falsehood in applying for the warrant; and 2) such statements or omissions were material or necessary to finding of probable cause."[46]

---

[45] ECF No. 52 at 10 (*citing Eckman v. Lancaster City*, 742 F. Supp. 2d 638, 657 (E.D. Pa. 2010)).
[46] *Freeman v. Murray*, 163 F.Supp.2d 478, 485 (M.D. Pa. 2001) (*citing Wilson v. Russo*, 212 F.3d 781, 786 (3d Cir. 2000)).

In the case at bar, Plaintiff does not point to any particular facts in arguing that Officer Whipple acted recklessly. Plaintiff does not allege that Officer Whipple knowingly, deliberately, or with reckless disregard for the truth, made false statements in composing the affidavit of probable cause or that he testified falsely at the preliminary hearing. Furthermore, this Court finds no evidence on the record that this is the case.

### B. Qualified Immunity

Officer Whipple also argues that he is entitled to qualified immunity because a reasonable police officer would have believed his reliance on CI Day was reasonable under the circumstances. Plaintiff disagrees and argues that Officer Whipple is not entitled to qualified immunity within the facts and circumstances of the case.

"[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."[47] Police officers can, therefore, be liable under Section 1983 if they are found to have violated an individual's constitutional rights. In *Saucier v. Katz*,[48] the Supreme Court of the United States articulated a two-pronged test for

---

[47] *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).
[48] 533 U.S. 194, 202 (2001).

courts to administer to determine whether or not a police officer is entitled to qualified immunity.

Under the *Saucier* test, a court must first decide if, taken in the light most favorable to the party asserting the injury, the facts alleged show that the officer's conduct violated a constitutional right.[49] If a violation of a constitutional right could be found, the court must also determine "whether the right was clearly established."[50] A right is clearly established if "a reasonable official would understand that what he is doing violates that right."[51] "[E]xisting precedent must have placed the statutory or constitutional question beyond debate."[52] *Saucier* and its progeny allow officers the flexibility to make reasonable but mistaken judgments and "protects 'all but the plainly incompetent or those who knowingly violate the law.'"[53]

Plaintiff argues that existing precedent has long established that the Fourth Amendments prohibits a police officer from arresting a citizen absent probable cause. As this Court has found that probable cause existed for Plaintiff's arrest, this argument is without merit; Officer Whipple is entitled to qualified immunity in this case.

---

[49] *Id.*

[50] *Id.* The Supreme Court later diluted the *Saucier* test, however, holding that while the sequence of the two-pronged test may be appropriate in some circumstances, it is no longer mandatory. *Pearson v. Callahan*, 555 U.S. 223 (2009). Accordingly, the decision as to which of the two prongs should be examined first is left to the sound discretion of the district court and in light of the circumstances of the particular case at hand. *Id*. at 236.

[51] *Carroll v. Carman*, 135 S. Ct. 348, 350 (2014) (*citing Anderson v. Creighton,* 483 U.S. 635, 640 (1987)).

[52] *Carroll*, 135 S. Ct. at 350 (*citing Ashcroft v. al-Kidd*, 563 U.S. 731 at ——, 131 S. Ct. 2074 at 2083 (2011)).

[53] *Carroll*, 135 S. Ct. at 350 (*citing al-Kidd*, 563 U.S. at ——, 131 S. Ct. at 2085 (internal citations omitted)).

**IV. CONCLUSION**

Consequently, and in accordance with the foregoing reasoning, Defendants'

motion for summary judgment is granted.

An appropriate Order follows.


BY THE COURT:


/s Matthew W. Brann
Matthew W. Brann
United States District Judge